FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATURAL GROCERS; CITIZENS FOR GMO LABELING; LABEL GMOS; RURAL VERMONT; GOOD EARTH NATURAL FOODS; PUGET CONSUMERS CO-OP; CENTER FOR FOOD SAFETY; NATIONAL ORGANIC COALITION, | No. 22-16770 <br><br> D.C. No. 3:20-cv-05151-JD <br><br> OPINION |

*Plaintiffs-Appellants*,

v.

BROOKE L. ROLLINS, Secretary of the United States Department of Agriculture; ERIN MORRIS, Administrator of the Agricultural Marketing Services; UNITED STATES DEPARTMENT OF AGRICULTURE,

*Defendants-Appellees*,

and

AMERICAN FARM BUREAU FEDERATION; UNITED STATES BEET SUGAR ASSOCIATION; AMERICAN SUGARBEET GROWERS ASSOCIATION,

> *Intervenor-Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of California
James Donato, District Judge, Presiding

Argued and Submitted October 22, 2024
San Francisco, California

Filed October 31, 2025

Before:  Ronald L. Gilman,[*] Kim McLane Wardlaw, and
Daniel P. Collins, Circuit Judges.

Opinion by Judge Collins

## SUMMARY[**]

### Administrative Procedure Act / Agricultural Marketing Service

In a case in which a group of grocery retailers and public interest organizations ("Plaintiffs") challenge the federal regulations establishing a national uniform disclosure standard governing the use of genetically modified

---

[*] The Honorable Ronald L. Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

ingredients in food, the panel reversed the district court's judgment in part, affirmed in part, and remanded.

The Secretary of Agriculture delegated the authority to establish the uniform disclosure standard to the Agricultural Marketing Service ("AMS").  Plaintiffs asserted that the AMS's disclosure standard was unlawful or arbitrary and capricious and should be set aside under the Administrative Procedure Act ("APA").

The district court's summary judgment order and accompanying judgment stated only that (1) Plaintiffs were granted summary judgment on their claim challenging two specific disclosure option regulations; and (2) summary judgment was denied in all other respects.  The panel construed the district court's ambiguous September 2023 judgment as implicitly granting summary judgment to the AMS and intervenor-defendants as to the remaining claims, thereby finally disposing of all claims and creating an appealable final judgment.

The panel held that Plaintiffs had Article III standing. Here, Plaintiffs seek non-monetary relief under the APA and the scope of the relief does not differ among each Plaintiff. The panel held that because at least one Plaintiff had standing to assert each of the three APA claims at issue, there was jurisdiction to consider the merits of those claims, without the need to consider the standing of the other Plaintiffs.

The panel held that the district court erred in rejecting Plaintiffs' claim that the AMS committed legal error by generally excluding highly refined foods from the definition of the phrase "bioengineered foods," which generally described the foods that were subject to the disclosure requirement.  The panel reversed the grant of summary

judgment to Defendants on Plaintiffs' APA cause of action challenging relevant regulatory provisions, and remanded to the district court with instructions (1) to grant summary judgment to Plaintiffs on that cause of action; (2) to remand the relevant regulations to the AMS; and (3) to determine, after receiving input from the parties, whether any provisions of the regulations should be vacated in connection with that remand to the agency.

The panel affirmed the district court's decision rejecting Plaintiffs' claim that the regulations were arbitrary and capricious to the extent that those regulations provide that the required disclosures must use the term "bioengineered." The panel held that the agency's decision to choose "bioengineered" as the uniform disclosure term, as opposed to "genetically engineered" or "genetically modified," reflected a reasonable consideration of the relevant issues.

The panel also held that the district court abused its discretion in declining to vacate the two disclosure-format regulations, contained in 7 C.F.R. §§ 66.106 and 66.108, that it held were invalid. The panel reversed and directed the district court to prospectively vacate those rules after receiving the parties' input as to the proper form of such a prospective vacatur.

# COUNSEL

George A. Kimbrell (argued), Meredith Stevenson, and Amy L. Van Saun, Center for Food Safety, Portland, Oregon, for Plaintiffs-Appellants.

Adam C. Jed (argued) and Mark B. Stern, Attorneys, Appellate Staff, Civil Division; Ismail Ramsey, United States Attorney; Brian M. Boynton, Principal Deputy Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Defendants-Appellees.

Bridget S. McCabe (argued), Baker Hostetler LLP, Los Angeles, California; Geraldine Edens, Geraldine Edens PA, Tampa, Florida; Christopher Marraro, Baker Hostetler LLP, Washington, D.C.; David Y. Chung and Daniel W. Wolff, Crowell & Moring LLP, Washington, D.C.; Emily T. Kuwahara, Crowell & Moring LLP, Los Angeles, California; for Intervenor-Defendants-Appellees.

Jessica L. Blome, Greenfire Law PC, Berkeley, California, for Amici Curiae the Non-GMO Project and the Health Research Institute.

Trenton H. Norris, Hogan Lovells LLP, San Francisco, California, for Amicus Curiae for Amicus Curiae the Consumer Brands Association.

# OPINION

COLLINS, Circuit Judge:

This case involves a challenge under the Administrative Procedure Act ("APA") to the federal regulations establishing a national uniform disclosure standard governing the use of genetically modified ingredients in food. In 2016, Congress enacted a statute directing the Secretary of Agriculture to establish such a uniform disclosure standard and generally preempting state disclosure laws relating to such foods. Pub. L. No. 114-216, 130 Stat. 834 (2016); 7 U.S.C. §§ 1639b(a)(1), 1639i(b). The Secretary delegated the relevant authority to the Agricultural Marketing Service ("AMS"), which promulgated the final regulations in late 2018. *See* National Bioengineered Food Disclosure Standard, 83 Fed. Reg. 65814 (Dec. 21, 2018). The AMS's disclosure standard, which became fully mandatory as of January 1, 2022, generally requires that the covered foods disclose, in one of several prescribed formats, that the food is "bioengineered" or contains a "bioengineered" ingredient. 7 C.F.R. §§ 66.102–66.108.

Plaintiffs, who are a group of grocery retailers and public interest organizations, brought this suit asserting, *inter alia*, that the AMS's disclosure standard was unlawful or arbitrary and capricious in various respects and should be set aside under the APA. *See* 5 U.S.C. § 706(2)(A). As relevant here, Plaintiffs asserted three APA claims. First, Plaintiffs argued that the AMS erred in excluding from the disclosure requirement any food that, even though made with genetically modified ingredients, was subsequently subject to a high level of processing that assertedly rendered any

genetically modified material "undetectable." Second, Plaintiffs asserted that the AMS should have required or allowed the mandated disclosures to be made using more familiar terms such as "genetically engineered," "genetically modified organism," or "GMO," rather than "bioengineered." Third, Plaintiffs challenged two regulatory provisions governing, respectively, the optional use of quick response ("QR") codes or text-messaging to accomplish the disclosures (in lieu of more conventional on-package statements or symbols). The district court rejected the first two claims, but it granted summary judgment to Plaintiffs on the third. As to the latter claim, however, the district court remanded the two challenged regulatory provisions to the AMS without vacating them.

We hold that the district court erred in rejecting Plaintiffs' claim that the AMS committed legal error by generally excluding highly refined foods from the definition of the phrase "bioengineered foods," which generally describes the foods that are subject to the disclosure requirement. We remand that issue to the AMS for further consideration in light of other statutory authorities that the agency failed to consider, and we direct the district court to address in the first instance whether the AMS's error on this score requires vacatur of any relevant portion of the regulations. We also conclude that the district court abused its discretion in declining to vacate the two disclosure-format provisions that it held were invalid, and we direct the district court to prospectively vacate those rules after receiving the parties' input as to the proper form of such a prospective vacatur. In all other respects, we affirm the district court's judgment.

## I

We begin with an overview of the relevant statutory and regulatory history to provide the necessary context to Plaintiffs' claims. We then summarize the factual and procedural history of this case.

## A

Public Law No. 114-216, which was enacted in July 2016, amends the Agricultural Marketing Act of 1946 ("AMA" or "the Act") by adding two new subtitles, which have been classified as subchapters V and VI of chapter 38 of the unenacted title 7 of the United States Code. *See* Pub. L. No. 114-216, § 1, 130 Stat. 834 (2016); *see also* 7 U.S.C. §§ 1639–1639j.[1] Specifically, the AMA's new subtitle E is titled "National Bioengineered Food Disclosure Standard," *see* 130 Stat. at 834, and § 293 of that subtitle sets forth the requirements that apply to a "national bioengineered food disclosure standard" that must be promulgated by the Secretary of Agriculture within 2 years, *see* 7 U.S.C. § 1639b(a)(1). New subtitle F of the AMA generally sets forth the preemptive scope of this national disclosure standard. *See* 130 Stat. at 838; *see also* 7 U.S.C. §§ 1639i–1639j.

Section 293(a)(1) of the AMA specifies that the required disclosure standard generally applies "with respect to any bioengineered food and any food that may be

---

[1] Because title 7 has not been enacted as positive law, we will generally refer to the AMA's provisions by their section numbers in the AMA, while also providing citations to the corresponding section numbers in title 7 of the U.S. Code. The current text of the AMA is available on the website of the Government Publishing Office at https://www.govinfo.gov/content/pkg/COMPS-10259/pdf/COMPS-10259.pdf.

bioengineered." 7 U.S.C. § 1639b(a)(1). The "foods" covered by the Act generally include only those foods subject to the "labeling requirements" of various federal statutes, including the Federal Food, Drug, and Cosmetic Act. *Id*. § 1639a(c). The Act defines "'bioengineering', . . . with respect to a food," to "refer[] to a food . . . that contains genetic material that has been modified through in vitro recombinant deoxyribonucleic acid (DNA) techniques" if "the modification could not otherwise be obtained through conventional breeding or found in nature." *Id*. § 1639(1). Under the Act, however, the actual language that regulated parties must use in the required disclosure is not necessarily limited to the specific statutory term "bioengineered," because the Act expressly gives the Secretary the authority to "determine[]" that a "similar term" also adequately captures the required disclosures. *Id*. Other terms in common use in the marketplace at the time of the enactment of subtitle E included "genetically engineered," "genetically modified organism," and "GMO". *See* 83 Fed. Reg. at 65836, 65851–52, 65858.

In addition to directing the Secretary to determine the exact language to be used in the required disclosures, the Act also addresses the format of those disclosures. Specifically, § 293(b)(2) states that the Secretary must "require that the form of a food disclosure . . . be a text, symbol, or electronic or digital link, . . . with the disclosure option to be selected by the food manufacturer." 7 U.S.C. § 1639b(b)(2)(D). The Act contains a number of provisions designed to bolster the efficacy of the electronic or digital link option, which (under current technology) would generally involve scanning a QR code with a smartphone. These include a requirement that any such QR code must be accompanied by on-package language instructing the consumer to "Scan here for more

food information," as well as a "telephone number that provides access to the bioengineering disclosure." *Id*. § 1639b(d)(1), (4). To address the possibility that the electronic or digital link disclosure option still might not prove to be an adequate method of disclosure, Congress directed the Secretary to "conduct a study to identify potential technological challenges" to consumers' access to the bioengineering disclosure through that option. *Id*. § 1639b(c)(1). If, after conducting the study, the Secretary determines that electronic or digital link disclosures would *not* afford consumers "sufficient access to the bioengineering disclosure," then the Secretary, after consulting "with food retailers and manufacturers," must "provide additional and comparable options to access the bioengineering disclosure." *Id*. § 1639b(c)(4).

Section 293(b)(2) also requires the Secretary to establish certain parameters concerning the scope of the disclosure standard. For example, the Secretary must "determine the amounts of a bioengineered substance that may be present in a food, as appropriate, in order for the food to *be* a bioengineered food" for purposes of the disclosure standard. 7 U.S.C. § 1639b(b)(2)(B) (emphasis added); *see also infra* section III(B). The Secretary shall also "establish a process for requesting and granting a determination by the Secretary regarding other factors and conditions under which a food is considered a bioengineered food." *Id*. § 1639b(b)(2)(C). Moreover, the Secretary's disclosure standard must prohibit "food derived from an animal" from being "considered a bioengineered food solely because the animal consumed feed produced from, containing, or consisting of a bioengineered substance." *Id*. § 1639b(b)(2)(A). In addition, the Secretary must provide certain alternative disclosure options in the case of "food contained in small or

very small packages" or "in the case of small food manufacturers." *Id*. § 1639b(b)(2)(E), (F). The Act further specifies that the disclosure standard shall exempt entirely "food served in a restaurant or similar retail food establishment" and "very small food manufacturers." *Id*. § 1639b(b)(2)(G).

As noted earlier, new subtitle F of the AMA sets forth the general preemptive scope of the Act with respect to such disclosures. Specifically, § 295 expressly preempts any state or local "requirement relating to the labeling of whether a food . . . is genetically engineered . . . or was developed or produced using genetic engineering." 7 U.S.C. § 1639i(b). Section 296, however, states that nothing in subtitles E or F or in any regulation promulgated under them "shall be construed to preempt any remedy created by a State or Federal statutory or common law right." *Id*. § 1639j. Section 293(e) of subtitle E also addresses the subject of preemption, providing that, "[n]otwithstanding section 295 [7 U.S.C. § 1639i]," no state or local law shall "establish . . . or continue in effect . . . any requirement relating to the labeling or disclosure of whether a food is bioengineered or was developed or produced using bioengineering . . . that is not identical" to the Secretary's disclosure standard governing such food. 130 Stat. at 837; 7 U.S.C. § 1639b(e). The Act also contains various provisions addressing how the required disclosure standard relates to other statutes concerning claims about foods, including the "Organic Foods Production Act of 1990." 7 U.S.C. § 1639b(f)(2); *see also id*. § 6501 *et seq*.

Section 293(g) of the AMA addresses the enforcement of the disclosure standard. In particular, § 293(g)(1) makes it "a prohibited act for a person to knowingly fail to make a disclosure as required under this section." 7 U.S.C.

§ 1639b(g)(1).  Entities subject to the disclosure requirement are required to maintain such records as the Secretary determines by regulation are necessary "to establish compliance with this section," and the Secretary is given power to conduct an "examination" or "audit" of such records.  *Id*. § 1639b(g)(2), (3).  The Act also provides, however, that "[t]he Secretary shall have no authority to recall any food subject" to the disclosure requirement "on the basis of whether the food bears a disclosure that the food is bioengineered."  *Id*. § 1639b(g)(4).

**B**

The Secretary of Agriculture delegated the authority to establish and administer the national bioengineered food disclosure standard to the AMS.  *See* National Bioengineered Food Disclosure Standard, 83 Fed. Reg. 19860, 19860 (May 4, 2018).  After receiving preliminary input from the public based on responses received to "30 questions posted on its website," the AMS issued a notice of proposed rulemaking in May 2018.  *Id*.  The AMS received "approximately 14,000 comments" on the proposed rule, and it thereafter issued its final rule in December 2018.  *See* National Bioengineered Food Disclosure Standard, 83 Fed. Reg. 65814, 65814 (Dec. 21, 2018); *see also* 7 C.F.R. § 66.1 *et seq*.  We highlight three particular aspects of the final regulations that are relevant to this appeal.

First, the AMS's regulations sought to address how the required disclosure standard should apply in the context of "refined foods" that were made from bioengineered ingredients.  83 Fed. Reg. at 65816.  As the notice of final rulemaking explained, the AMS's earlier notice had "invited public comment on two different interpretations of the statutory definition of 'bioengineering' and on the scope of

the regulatory definition of 'bioengineered food.'"  *Id*.  The
AMS described the two different interpretations as follows:

> The first interpretation, identified as
> Position 1 in the NPRM [Notice of Proposed
> Rulemaking], stated that refined products do
> not "contain genetic material that has been
> modified through in vitro recombinant
> deoxyribonucleic acid (DNA) techniques"
> because the refining process rendered genetic
> material undetectable using common testing
> methods.  The second interpretation,
> identified as Position 2 in the NPRM, stated
> that the scope of the definition of
> "bioengineering" applies to all foods
> produced from bioengineering, such as
> refined products.

*Id*.

In its final rule, the AMS adopted "Position 1 with some
modifications."  83 Fed. Reg. at 65816.  In implementing
that approach, the AMS adopted a regulatory definition of
the term "bioengineered" that differed from the statutory
definition.  Whereas the Act defines "bioengineering, . . .
with respect to a food," as generally referring to a food that
"contains genetic material that has been modified through in
vitro recombinant [DNA] techniques," 7 U.S.C. § 1639(1),
the AMS's regulation adds a proviso to that definition stating
that "[s]uch a food does not contain modified genetic
material if the genetic material is not *detectable* pursuant to
§ 66.9." 7 C.F.R. § 66.1 (emphasis added).  Section 66.9, in
turn, sets forth the various ways in which manufacturers
could attempt to establish such non-detectability, and it

requires them to keep sufficient records to support any such claim. *Id*. § 66.9.

Second, the final rule requires all disclosures—in whatever format—to use the statutory term "bioengineered." *See* 7 C.F.R. §§ 66.102–66.108. Thus, while manufacturers remain free to add additional terms that otherwise comply with applicable law, *see* 83 Fed. Reg. at 65852; *see also* 7 C.F.R. § 66.118, they can satisfy the disclosure requirement only by using the term "bioengineered." The AMS explained that it was requiring this uniform term because it was the term "used by Congress in the amended Act"; that term "clearly and accurately describes the technology" being disclosed and "provides consumers with the information they desire"; and this approach would "ensur[e] disclosure consistency and minimiz[e] marketplace confusion." 83 Fed. Reg. at 65851–52.

Third, the final rule addressed the Secretary's response to the statutorily required study about the electronic or digital link disclosure option. That study, the Secretary concluded, demonstrated that this option would *not* provide consumers with adequate access to the disclosure "under ordinary shopping conditions at this time." 83 Fed. Reg. at 65828. As a result of this finding, the AMS was required to "provide additional and comparable options to access the bioengineering disclosure." 7 U.S.C. § 1639b(c)(4). The AMS stated that it was therefore adopting an independent text-message disclosure option as a fourth alternative, in addition to the statutorily mandated text, symbol, and electronic or digital link disclosure options. *See* 83 Fed. Reg. at 65828; *see also* 7 C.F.R. § 66.108. Moreover, despite finding that the study had shown the electronic or digital link disclosure option to be inadequate, the AMS stated that the rule would nonetheless retain that option,

because it was "mandated by the amended Act," 83 Fed. Reg. at 65853, and the AMS therefore lacked the "authority to eliminate" it, *id*. at 65855. *See* 7 C.F.R. § 66.106.

## C

Plaintiffs Natural Grocers, Citizens for GMO Labeling, Label GMOs, Rural Vermont, Good Earth Natural Foods, Puget Consumers Co-op, National Organic Coalition, and Center for Food Safety are a collection of retailers and public interest organizations. They brought this action in July 2020 against the United States Department of Agriculture, the Secretary of Agriculture, and the Administrator of the AMS. Because the relevant authority conferred on the Secretary under the Act has been delegated to the AMS, we will, for simplicity, generally refer to these Defendants collectively as "the AMS."

In three separate causes of action under the APA, Plaintiffs' operative complaint challenged the three above-described aspects of the AMS's regulations, asserting that the relevant regulations were inconsistent with the amended AMA and were "arbitrary and capricious" and contrary to law within the meaning of the APA.[2] *See* 5 U.S.C. § 706(2)(A). Specifically, Plaintiffs asserted APA claims challenging (1) the exclusion of highly refined foods from the definition of "bioengineered foods"; (2) the requirement to use the term "bioengineered" in the mandated disclosures; and (3) the two provisions governing the options of using QR codes or text-messaging to accomplish the required disclosures.

---

[2] Plaintiffs also asserted three constitutional claims on various grounds, but these claims were rejected by the district court, and Plaintiffs have abandoned them on appeal.

Acting under Federal Rule of Civil Procedure 24(b), the district court in June 2021 allowed three organizations to intervene permissively as additional Defendants, *viz*., the United States Beet Sugar Association, the American Sugarbeet Growers Association, and the American Farm Bureau Federation (collectively, "Intervenors").

Plaintiffs moved for summary judgment on all of their claims in November 2021. In accordance with the parties' joint proposal in the district court concerning summary judgment briefing, the AMS and Intervenors did not formally cross-move for summary judgment. Instead, as explained in that joint submission, the AMS and Intervenors stated that they would rely on the court's *sua sponte* power to "enter summary judgment in their favor on all or some claims pursuant to Federal Rule of Civil Procedure 56(f)," and Plaintiffs correspondingly agreed that they were "on notice that the Court may grant summary judgment for the nonmovants on all or some claims and that Plaintiffs will have an opportunity to respond to Defendants' and Intervenors' arguments in their reply brief." *See* FED. R. CIV. P. 56(f)(1) (stating that, "[a]fter giving notice and a reasonable time to respond, the court may . . . grant summary judgment for a nonmovant"). Accordingly, the AMS's opposition to Plaintiffs' motion expressly asked the district court to deny Plaintiffs' motion and to "enter judgment in favor of Defendants pursuant to Federal Rule of Civil Procedure 56(f)." Intervenors' opposition likewise requested that the district court deny Plaintiffs' motion "and enter judgment in favor of Defendants and Intervenors."

On September 13, 2022, the district court granted summary judgment to Plaintiffs on their APA cause of action challenging the two regulatory provisions addressing, respectively, the electronic or digital link disclosure option

(7 C.F.R. § 66.106) and the AMS's new text-message disclosure option (*id*. § 66.108).  However, the district court rejected Plaintiffs' request to vacate these two provisions, and it instead remanded them "without vacatur."  The district court denied Plaintiffs' summary judgment motion "in all other respects."  The district court entered a corresponding judgment the same day.  Plaintiffs timely appealed.

## II

Before turning to the merits of Plaintiffs' appeal, we first address two issues concerning our jurisdiction, one statutory and one constitutional.

## A

By statute, we have jurisdiction over "all *final* decisions of the district courts."  *See* 28 U.S.C. § 1291 (emphasis added).  Ordinarily, "a denial of a motion for summary judgment is not a final order and thus not appealable." *Abend v. MCA, Inc.*, 863 F.2d 1465, 1482 n.20 (9th Cir. 1988).  However,  if that denial is coupled with a "*grant* of summary judgment" on all remaining claims to the non-moving party, the result will be a final decision that would then give us jurisdiction to review the denial as well.  *See id*.

The problem in the instant case is that both the district court's summary judgment order and its accompanying judgment stated only (1) that Plaintiffs were granted summary judgment on their claim challenging two specific disclosure-option regulations; and (2) that "[s]ummary judgment is *denied* in all other respects" (emphasis added). Thus, although the AMS and Intervenors had both expressly asked the district court to enter summary judgment in their favor *sua sponte* under Rule 56(f), the district court's order and judgment failed to state that explicitly.

To resolve any potential ambiguity in this court's jurisdiction, Plaintiffs (after having already appealed the judgment) filed an unopposed motion in the district court for an indicative ruling under Federal Rule of Civil Procedure 62.1. *See* FED. R. CIV. P. 62.1(a)(3) (allowing the district court, in response to a motion seeking relief while an appeal is pending, to "state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue"); *see also* FED. R. APP. P. 12.1(b) (authorizing the court of appeals, in response to such a statement by the district court, to "remand for further proceedings" while retaining jurisdiction). That motion asked the district court to state that, if a limited remand were granted, the district court would amend its judgment to clarify that it was indeed a final judgment that affirmatively resolved the remaining claims in the AMS's and Intervenors' favor. Specifically, Plaintiffs' motion suggested that the district court should amend the judgment by replacing the statement that "Summary judgment is denied in all other respects" with the following: "Because plaintiffs' summary judgment motion is denied in all other respects, judgment is entered for defendants and intervenors on all other claims pursuant to Federal Rules of Civil Procedure 56(f)(1) and 58." In March 2023, the district court denied the motion for an indicative ruling, stating that "the judgment provides total clarity on the disposition of the case."

Contrary to what the district court thought, the literal language of the judgment did not provide "total clarity" as to the disposition of the case, because it lacked any language actually disposing of the claims as to which it announced that summary judgment had been *denied*. At the same time, the district court's formal entry of judgment certainly indicates that the court thought that it had disposed of all claims and

that it intended to do so.  We therefore deem the judgment to be facially ambiguous.  In such situations, our obligation is "to construe the judgment so as to give effect to the intention of the issuing court, considering the entire record before the issuing court," including its prior rulings.  *United States v. DAS Corp.*, 18 F.4th 1032, 1041 (9th Cir. 2021) (simplified). Viewing the September 2022 judgment in the context of "the record before the district court at the time it issued the judgment," *id*., including the procedural history of the case, the parties' motion papers, and the district court's prior orders, we have little doubt that the district court's intention was to grant summary judgment *sua sponte* under Rule 56(f) to the AMS and Intervenors with respect to those claims as to which Plaintiffs' summary judgment motion had been denied.  We therefore construe the ambiguous September 2022 judgment as *implicitly* granting summary judgment to the AMS and Intervenors as to those remaining claims, thereby finally disposing of all claims and creating an appealable final judgment.

## B

Although the AMS has not challenged Plaintiffs' Article III standing in its appellate brief, we have "an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be addressed by a favorable decision."  *Friends of the*

*Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180–81 (2000). Plaintiffs must satisfy these requirements "for each claim that they press and for each form of relief that they seek." *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). However, where (as here) Plaintiffs seek non-monetary relief under the APA and the scope of the relief available does not differ among each Plaintiff, *see infra* note 7, it suffices if at least one Plaintiff has Article III standing as to each of the claims at issue. *See Secretary of the Interior v. California*, 464 U.S. 312, 319 n.3 (1984) ("Since the State of California clearly does have standing, we need not address the standing of the other [plaintiffs], whose position here is identical to the State's."); *Melendres v. Arpaio*, 695 F.3d 990, 999 (9th Cir. 2012) ("The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others." (citation omitted)).

In connection with their summary judgment motion, Plaintiffs presented a number of declarations in an effort to establish their Article III standing to assert their various claims. In their oppositions to Plaintiffs' motion, neither the AMS nor Intervenors contested these declarations for standing purposes or presented any contrary evidence as to Plaintiffs' standing. Accordingly, we take the facts set forth in those declarations as uncontested with respect to Article III standing for purposes of both Plaintiffs' summary judgment motion and the AMS's and Intervenors' request for *sua sponte* summary judgment in their favor.

Natural Grocers' uncontested declaration from one of its officers suffices to establish the company's standing to challenge the disclosure standard's exclusion of those foods that, due to refining processes, have no detectable genetically modified material under the rule's detectability

standards. The declaration explains that, based on the company's "founding principles as well as customer demand," Natural Grocers' 162 stores in 20 States are committed "to avoid selling genetically engineered (GE) products," which in the company's view include the sort of highly refined foods excluded by the challenged provision of the AMS's final rule. The declaration explains that, had the AMS complied with its obligation to include such foods in its labeling program, Natural Grocers would thereby have a ready-made way to identify such foods and to keep them off its shelves. Instead, Natural Grocers asserts, it must continue to undertake expensive efforts to identify such items on its own. Because these added expenses in meeting its customers' market-based demands would be avoided if the AMS included highly refined foods in its labeling program, Natural Grocers has identified a concrete injury to itself that is fairly traceable to the AMS's alleged unlawful conduct and that would be redressed by a decision in Natural Grocers' favor.

Declarations from an official of the Center for Food Safety ("CFS") and from several of CFS's members are sufficient to establish that organization's associational standing to assert, on behalf of its members, APA claims challenging (1) the requirement to use the term "bioengineered" in disclosures; and (2) the AMS's decision to allow the use of allegedly unlawful and deficient QR-code and text-message disclosure options. Under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977), an organization has "associational standing" to sue on behalf of its members if it can demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the

claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id*. at 343. CFS's unchallenged evidence establishes all of these required elements under *Hunt* with respect to these two APA claims.

Multiple CFS members' declarations confirm that these members find the term "bioengineered" to be unclear and confusing, in contrast to the more familiar terms "genetically engineered" or "GMO." They also confirm that the use of disclosure options (such as QR codes and text-messaging) that require use of a smartphone in the grocery store aisle would create concrete logistical hurdles for them in accessing the disclosures. These CFS members (and inferentially many others like them) are injured by the asserted lack of immediate on-the-spot access to clear and readily accessible disclosure information; those injuries are fairly traceable to the challenged regulatory provisions; and they would be redressed by a decision upholding these challenges and invalidating the regulations in question. The first element of the *Hunt* associational standing test—*viz*., that CFS's members would have Article III standing in their own right—is therefore met.

The other two elements of the *Hunt* test are also satisfied. Given the declaration from a CFS official setting forth the organization's long history of promoting clear and accessible labeling of genetically engineered foods, the interests that CFS seeks to represent in these two APA claims are plainly "germane to the organization's purpose." *Hunt*, 432 U.S. at 343. And, as the course of this litigation has shown, these APA claims do not require the participation of individual members of CFS. *Id*.

Because at least one Plaintiff has standing to assert each of the three APA claims at issue, we have jurisdiction to consider the merits of these claims, without the need to consider the standing of the other Plaintiffs. *See Melendres*, 695 F.3d at 999. We therefore proceed to address the merits of those three claims.

## III

We first address Plaintiffs' APA claim challenging the AMS's decision to effectively exempt from the disclosure standard most highly refined foods made from bioengineered ingredients. Specifically, Plaintiffs contend that the AMS acted arbitrarily and capriciously, and contrary to law, when it adopted regulations stating that foods made with bioengineered ingredients would nonetheless be excluded from the definition of "bioengineered foods," which delineates the scope of the disclosure standard, if (due to refining or other processing) the "genetic material" in those ingredients "is not detectable" in the final food product under the detectability standards set forth in the regulations. 7 C.F.R. § 66.1. Instead, Plaintiffs assert, the AMS was required to mandate disclosure for "*all* foods"—including such "highly refined" foods—"that so much as *may contain* genetic material that has been modified at some point during production, not just some foods." We agree with the first argument, but not the second.

## A

As we have explained, § 293(a)(1) of the Act requires the Secretary of Agriculture to adopt regulations that "establish a national mandatory bioengineered food disclosure standard with respect to any bioengineered food and any food that may be bioengineered." 7 U.S.C. § 1639b(a)(1). The Act does not itself define exactly what that "standard"

should be, but it does set forth a list of various "requirements" that must be included in the regulations establishing the standard. *Id*. § 1639b(b)(2). Because the disclosure standard established by the agency must be one "with respect to" foods that are or may be "bioengineered," the meaning of the latter term is crucial to understanding the outer bounds of what that disclosure requirement can be. *Id*. § 1639b(a)(1).

Strictly speaking, the Act does not define the term "bioengineered," but it does include a definition of the related term "bioengineering." Specifically, § 291(1) states that "[t]he term 'bioengineering,' . . . with respect to a food, refers to a food" (1) that "*contains* genetic material that has been modified through in vitro recombinant deoxyribonucleic acid (DNA) techniques"; and (2) "for which the modification could not otherwise be obtained through conventional breeding or found in nature." 7 U.S.C. § 1639(1) (emphasis added).

In its regulations establishing the required "national mandatory bioengineered food disclosure standard," the AMS generally mandated a disclosure label only for a "food [that] is a bioengineered food or contains a bioengineered food ingredient," 7 C.F.R. § 66.3(a)(1), and the AMS adopted a definition of "bioengineered food" that generally follows the statutory definition of "bioengineering" almost verbatim, *id*. § 66.1. However, there is one crucial difference: although it otherwise tracks the statutory definition, which focuses on whether the food "contains" modified genetic material, the regulation's definition of "bioengineered" adds an explicit proviso stating that "[s]uch a food does not *contain* modified genetic material if the genetic material is not *detectable* pursuant to § 66.9." *Id*. § 66.1 (emphasis added). Section 66.9 of the regulations

provides, in turn, that genetic material is not "detectable" in a food if the responsible entity maintains sufficient records to show that one of the following three alternatives is true: (1) "the food is sourced from a non-bioengineered crop or source"; (2) "the food had been subjected to a refinement *process* validated to make the modified genetic material in the food undetectable"; or (3) "analysis or . . . testing appropriate to the specific food . . . confirm[s] the absence of modified genetic material." *Id*. § 66.9(a) (emphasis added). Accordingly, under the regulations, a food that meets any one of these three alternative non-detectability standards is wholly exempt from the regulation's bioengineering disclosure requirement.

Plaintiffs do not contest that, if all of a food's sources are themselves non-bioengineered, *see* 7 C.F.R. § 66.9(a)(1) (listing this as the first non-detectability option), then that food clearly does not "contain" modified genetic material and is properly excluded from the disclosure standard. But Plaintiffs contend that, with respect to foods that *were* made from bioengineered ingredients, the AMS committed an error of law in concluding that such a food does not "contain" modified genetic material if that material is not "detectable" under one of the *other* two regulatory alternatives. We agree.

Because the Act does not define what it means for a food to "contain" modified genetic material, we construe that term in accordance with its ordinary meaning. *Burrage v. United States*, 571 U.S. 204, 210 (2014). In common parlance, "contain" means "[t]o have within" or "[t]o have as a component or constituent part." *Contain*, AMERICAN HERITAGE DICTIONARY 396 (5th ed. 2018); *see also Contain*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 490–91 (1981 ed.) ("to have within" or "to consist of wholly or in

part"). Thus, a food is "bioengineered" if it *actually has* modified genetic material within it. That understanding of when a food "contains" modified genetic material is plainly distinct from one's ability to ascertain the actual presence of such material using a *particular* means of detection. Even without having to resort to epistemological philosophizing, there is an obvious and important difference between whether a substance is actually present and whether, using a particular method, one is able to detect that the substance is present.

The AMS suggests that this theoretical distinction ultimately does not matter, because our legal system does not require that something be "establish[ed] with certainty," but only that it be established by a preponderance of the evidence. Thus, according to the AMS, if a manufacturer carries its burden to show that the genetically modified material is undetectable under the regulation, it has sufficiently established the legal conclusion that the food in question does not "contain" the substance. In that sense, the AMS posits, saying that genetic modified material is not "detectable" in a food under the described methods is legally equivalent to saying that the food does not "contain" such material. We reject this contention.

The AMS regulation itself confirms that a showing of non-detectability of genetically modified material under its particular standards is not legally equivalent to a determination that the food in question does not "contain" such material. The regulation explicitly recognizes that, if a particular detection technique is not "sufficiently sensitive," 7 C.F.R. § 66.9(c)(4), it will inaccurately fail to detect that the food really does "contain" modified genetic material. Similarly, the administrative record confirms the undisputed fact that different detection methods will have different

"limits of detection"—meaning that, even if a given method finds no modified genetic material, such material may nonetheless be present in quantities *below* that method's limit. Moreover, the AMS's analysis accompanying the final rule explicitly states that, if a "future" detection method is more accurate than earlier ones, a food that would currently be exempted from disclosure under the regulation's non-detection proviso would then become subject to the disclosure requirement. *See* 83 Fed. Reg. at 65834. But despite recognizing the crucial role that measurement sensitivity plays in any effort to use particular detection methods to establish that a food does not "contain" genetically modified material, the regulation does not define what counts as a "sufficiently sensitive" detection method.

The details of the AMS's detection-method regulation further confirm that non-detectability under its provisions is not legally equivalent to a finding that the food does not "contain" genetically modified material. For example, one of the two non-detectability options allowed under the regulation is to show, not that the particular food batch itself has no detectable genetically modified material, but rather that the batch was "subjected to a refinement *process* validated to make the modified genetic material in the food undetectable." 7 C.F.R. § 66.9(a)(2) (emphasis added). The regulation thus presumes that if the "process" used to refine the food has been shown, as a general matter, to render genetically modified material undetectable, then no actual testing of the food itself is required. As the regulation states, "[o]nce a refining process has been so validated, additional testing is not necessary to confirm the absence of detectable modified genetic material in food subsequently refined through that process, provided that no significant changes are made to the validated process and provided that records

are maintained to demonstrate that the refining process has been validated and that the validated refining process is followed." *Id*. § 66.9(b)(2). By its terms, the latter provision allows a manufacturer to continue to use a *previously* "validated" process so long as "no significant changes are made" to that "*process*." *Id*. (emphasis added). Because the text of the regulation addresses only changes to the "process" and *not* to the "testing" that was used to validate it, the plain language of the rule thus allows manufacturers to continue to use that unchanged process, even if subsequently developed tests are now able to discern the presence of genetically modified material. Although the AMS insists in its appellate brief that "it would generally be incumbent on regulated entities to make use" of any such subsequently developed improved testing methods, the AMS was unable to point to any language of the regulation that actually says that.

For all of these reasons, the AMS committed legal error in concluding that, under "the plain language of the amended Act," "if a food does not contain *detectable* modified genetic material, it is not a bioengineered food" within the meaning of the Act. 83 Fed. Reg. at 65835–36; *see also id*. at 65837 (stating that the AMS was adopting its detectability standard "based on the plain language of the amended Act"); *id*. at 65843 (stating that its detectability standard follows from the "statutory definition of bioengineering").

The AMS nonetheless contends that the regulation may still be upheld on an alternative ground that was identified by the district court—namely, that the agency's detectability standard is a permissible exercise of its power, under § 293(b)(2)(B) of the Act, to set "amounts" below which the potential presence of genetically modified material may be disregarded. Even assuming *arguendo* that § 293(b)(2)(B)

grants such discretion—a question we address *infra* in section III(B)—this argument cannot save the regulations challenged here.

Any invocation of the AMS's authority under § 293(b)(2)(B) involves an exercise of agency *discretion*, and it is firmly established that, under *SEC v. Chenery Corp.*, 332 U.S. 194 (1947), we may uphold an exercise of agency discretion "*only* 'on the same basis articulated in the order by the agency itself.'" *Calcutt v. FDIC*, 598 U.S. 623, 624 (2023) (emphasis added) (citation omitted). In justifying its detectability standard, however, the AMS relied entirely on the flawed *legal* premise that the non-detectability of a substance under the regulation was equivalent to its non-presence. Indeed, the agency's justification for that standard never once even mentioned, much less relied on, its discretionary authority under § 293(b)(2)(B). *See* 82 Fed. Reg. at 65815–17, 65833–37. Instead, the AMS invoked its discretionary authority under § 293(b)(2)(B) only in a separate section of the regulations, in which it set "an allowance for *inadvertent or technically unavoidable* [bioengineered] presence of up to 5% for each ingredient, 7 C.F.R. § 66.5(c) (emphasis added), such as when non-bioengineered crops are inadvertently cross-pollinated by nearby bioengineered crops or are processed using equipment that (from prior use) may contain trace amounts of bioengineered substances, *see* 83 Fed. Reg. at 65848. Moreover, the regulation's express limitation of that 5% exemption to only those situations in which the presence of genetically modified material is "inadvertent or technically unavoidable" was deliberate, because the AMS explicitly rejected a proposal to apply a similar 5% exemption "for the *intentional* use of a [bioengineered] substance" as an input. *Id*. at 65850 (emphasis added). Because the AMS failed to

analyze the detectability issue under the framework of its discretionary authority under § 293(b)(2)(B), we cannot uphold it on that basis, and the district court erred in doing so.

At oral argument, the AMS suggested that its detectability standard may be upheld on the further alternative ground that, by directing the agency to "establish a national mandatory bioengineered food disclosure standard *with respect to* any bioengineered food and any food that may be bioengineered," 7 U.S.C. § 1639b(a)(1) (emphasis added), the Act grants the agency wide discretion to decide how to craft any disclosure requirement and what exceptions to make to it. We disagree. Once again, the AMS did not rely on any claimed exercise of this asserted discretion when it adopted its detectability standard. Instead, the AMS consistently took the contrary position that "the definition of 'bioengineering' *sets forth the scope of the mandatory disclosure*," and it exempted foods that had no detectable genetically modified material from that disclosure *only* because, in its view, such foods did not "contain" such material and therefore did not fall within the scope-delineating definition of "bioengineering." 83 Fed. Reg. at 65816 (emphasis added). The *Chenery* rule therefore bars us from upholding the AMS's detectability standard on that basis. Moreover, the AMS never made this argument in its answering brief, and we therefore deem it to have been forfeited. *See United States v. Dreyer*, 804 F.3d 1266, 1277 (9th Cir. 2015) ("Generally, an appellee waives any argument it fails to raise in its answering brief.").

Accordingly, we conclude that, by exempting from the definition of "bioengineered food" any food in which "genetic material is not detectable pursuant to § 66.9,"

7 C.F.R. § 66.1(1)(ii), the AMS acted "not in accordance with law."  5 U.S.C. § 706(2)(A).

## B

As noted earlier, Plaintiffs contend that the AMS's detectability standard is contrary to law in a second and broader respect—according to Plaintiffs, the AMS lacks *any* discretionary authority, under § 293(b)(2)(B) or otherwise, to adopt a detectability exception for highly processed foods made from bioengineered ingredients.  Instead, according to Plaintiffs, the agency *must* impose a disclosure requirement on all such highly processed foods, and the regulation here is unlawful to the extent that it failed to do so.  We conclude that Plaintiffs' legal position on this score cannot be squared with the language of § 293(b)(2)(B).

By directing the agency to determine "the *amounts* of a bioengineered substance that may be present in food, as appropriate, *in order for the food to be a bioengineered food*," 7 U.S.C. § 1639b(b)(2)(B) (emphasis added), the statute unmistakably directs the agency to set the *levels* of bioengineered substances that, if present, will *qualify* the food "to be a bioengineered food," *id*.  The necessary concomitant of that level-setting authority is that, once an "appropriate" level is set, the potential presence of bioengineered substances below that level will *not* suffice "in order for the food to be a bioengineered food."  *Id*. Viewed that way, the discretionary authority granted under § 293(b)(2)(B) is directly relevant to the issue of the detectability of bioengineered substances in a given food. As we have explained, the detectability of a substance necessarily turns on the relevant "limit of detection" associated with a particular measure of detectability.  *See supra* at 26–27.  If, for example, the agency were to adopt a

particular *limit of detection* as fixing the "amount" of a bioengineered substance that may be potentially present "in order for the food to be a bioengineered food," 7 U.S.C. § 1639b(b)(2)(B), then a showing that the substance cannot be detected within that limit in a food would mean that the food does not qualify as a "bioengineered food" under the regulatory standard authorized by § 293(b)(2)(B). But even then, that food would still otherwise meet the broad statutory definition of "bioengineered" food that we have described; it would *not* count as a "bioengineered food" under the regulatory standard *only* because it was excluded under a limit-of-detection-based standard promulgated under § 293(b)(2)(B).

Thus, while we agree with Plaintiffs that the *particular* detectability standard that the AMS adopted here—which did not rely on the discretionary authority conferred by § 293(b)(2)(B)—cannot be sustained based on that provision, we also conclude that it remains open to the agency to address the subject of detectability by a proper exercise of that authority on remand. We therefore reject Plaintiffs' argument that the agency's only option is to require disclosure with respect to all highly processed foods made from bioengineered ingredients, without regard to any measure of detectability.

Plaintiffs present several arguments for a contrary reading of § 293(b)(2)(B), but none of them are persuasive. First, Plaintiffs assert that the provision grants authority only to determine "amounts to *include* more foods in the scope of disclosure, not *exclude* them." However, when considered in light of the Act's broad definition of "bioengineer[ed]" food, this reading of § 293(b)(2)(B) makes little sense. As we have explained, a food falls within the definition of a "bioengineer[ed]" food under § 239(1) if it "*contains* genetic

material that has been modified," 7 U.S.C. § 1639(1) (emphasis added), and that definition does *not* require any minimum threshold "amount" of such material in order for a food to be considered a bioengineered food. Accordingly, any presence of bioengineered material *already* suffices to make a food "bioengineer[ed]" under the default statutory definition. Against that backdrop, § 293(b)(2)(B)'s authority to set "amounts" that may be present "in order for the food to be a bioengineered food," *id*. § 1639b(b)(2)(B), cannot reasonably be read as granting authority to *add* anything to the definition of "bioengineer[ed]" food. The only conceivable purpose for setting an "amount" of a bioengineered substance that may be present "in order for the food to be a bioengineered food," *id*., is to exclude those foods in which the quantity of bioengineered substances that may be present in that food is *below* that "amount."

Second, Plaintiffs argue that the authority granted by § 293(b)(2)(B) may be exercised only to exclude those foods that contain small amounts of bioengineered substances as a result of "inadvertent" circumstances rather than "intentional" acts. The problem with this argument is that nothing in the text of § 293(b)(2)(B) imposes any such limitation on the agency's authority under that section, and "we cannot rewrite the statute to insert an additional restriction that Congress omitted." *Charboneau v. Davis*, 87 F.4th 443, 454 (9th Cir. 2023). Plaintiffs note that, in a separate part of its regulations that are not challenged here, the agency created a distinct exception under § 293(b)(2)(B) that applies *only* to the "inadvertent or technically unavoidable" presence of bioengineered material. *See* 7 C.F.R. § 66.5(c); *see also supra* at 30. That point is irrelevant here. Because the AMS did *not* address the issue of detectability under the rubric of its authority under

§ 293(b)(2)(B), the agency has not had the opportunity to consider whether an inadvertence requirement makes sense as a policy matter in that distinct context. And to the extent that Plaintiffs contend that § 66.5(c)'s inadvertence requirement reflects the agency's *legal* view as to the limits of its authority under § 293(b)(2)(B), there is nothing in the administrative record to support the premise that the agency adopted that legal view. And even if the AMS had adopted that legal view, it would not be binding on us. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024).

Plaintiffs next suggest that allowing detectability to be addressed under § 293(b)(2)(B) would render surplusage the separate statutory exemption contained in § 293(b)(2)(A), which requires that the AMS's disclosure standard "prohibit a food derived from an animal" from being "considered a bioengineered food solely because the animal consumed feed produced from, containing, or consisting of a bioengineered substance." 7 U.S.C. § 1639b(b)(2)(A). According to Plaintiffs, because "[m]eat from livestock fed GE [*i.e.*, genetically engineered] corn or soy does not contain detectable GE material" under any meaningful standard, such meat would already be excluded under any detectability standard set under § 293(b)(2)(B), thereby rendering § 293(b)(2)(A) wholly unnecessary and surplusage. We disagree.

By its terms, § 293(b)(2)(A) is framed as a minimum rule of construction generally specifying that, under the required disclosure standard, foods derived from animals that have been fed bioengineered feed shall not themselves be considered to be bioengineered foods "solely" because of that fact. 7 U.S.C. § 1639b(b)(2)(A). Congress thus explicitly sought to ensure that, *in all events*, the standard adopted by the agency would not rely on such purely

derivative theories as to when a food "contains" bioengineered material.  Viewed in this context, the fact that our reading of § 293(b)(2)(B) coheres with that explicit rule of construction is a point in its *favor*, not a point against it. To the extent that this introduces a measure of functional redundancy between § 293(b)(2)(A) and § 293(b)(2)(B), that is best understood as "a congressional effort to be doubly sure" that such derivative theories of bioengineered food were ruled out.  *Barton v. Barr*, 590 U.S. 222, 239 (2020); *see also Atlantic Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020) (noting that "[s]ometimes the better overall reading of the statute contains some redundancy," such as when "Congress employ[s] a belt and suspenders approach to make sure" that a particular rule is established (citation omitted)).

Because we conclude that the discretionary authority granted in § 293(b)(2)(B) could allow the AMS to address the issue of detectability by setting relevant "amounts of a bioengineered substance" that, if present, would qualify "the food to be a bioengineered food," 7 U.S.C. § 1639b(b)(2)(B), we reject Plaintiffs' contention that we should order the AMS, on remand, simply to impose a disclosure requirement on all highly processed foods that were made from bioengineered ingredients.[3]

---

[3] Given our analysis with respect to § 293(b)(2)(B), we need not address the parties' contentions as to whether the AMS's authority under § 293(b)(2)(C) might also provide a regulatory basis for addressing detectability.  *See* 7 U.S.C. § 1639b(b)(2)(C) (stating that the agency's regulations must "establish a process for requesting and granting a determination by the Secretary regarding other factors and conditions under which a food is considered a bioengineered food").

**C**

Having concluded (1) that the AMS committed legal error by exempting from the definition of "bioengineered food" any food in which "genetic material is not detectable pursuant to § 66.9," 7 C.F.R. § 66.1(1)(ii); and (2) that the AMS nonetheless has authority under § 293(b)(2)(B) to address the issue of detectability, we next consider whether, in connection with a remand to the agency, any relevant provisions of the regulations should be vacated.  Because neither side argued for the particular combination of conclusions that we have reached, neither side has provided us with any relevant briefing on that vacatur issue.  Although we could conceivably request supplemental briefing on that point, we are also mindful that this case does not come to us directly from the agency by way of a petition for review, but rather from the district court by way of an appeal from that court's judgment in this APA action.  Consequently, we conclude that it would be best to allow the district court to address this issue in the first instance on remand and for it to determine which portions of the relevant regulations, if any, to vacate or to leave in place pending the district court's remand of the matter to the agency.  *See Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1049 (10th Cir. 2023); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1291 (11th Cir. 2015).

**IV**

Plaintiffs also challenge the AMS's regulations as arbitrary and capricious to the extent that they provide that the required disclosures must use the term "bioengineered." According to Plaintiffs, terms such as "genetically engineered" or "genetically modified" are more familiar to consumers and less confusing than "bioengineered," and

requiring or allowing the use of those terms to satisfy the disclosure requirement would better implement the Act's provisions. We affirm the district court's decision rejecting this claim.

## A

In defining the term "bioengineering," the Act expressly provides that this same definition will apply to "any similar term, as determined by the Secretary." 7 U.S.C. § 1639(1). In light of this provision, the AMS has the authority to establish a "disclosure standard with respect to any bioengineered food" under § 293(a)(1) that would require or allow a regulated entity to make its disclosure by using an agency-specified term *other* than "bioengineered." *Id*. § 1639b(a)(1).

Other provisions of the Act reflect, on their face, some of the possible alternative terms that the agency could conceivably consider as potentially "similar." For example, § 294(c) prohibits an entity from labeling or advertising a food as "not bioengineered" merely because that food is not subject to the disclosure standard established under the Act, and § 294(c) extends that same prohibition to a claim that the food is "*non-GMO*" or to "any *other similar claim* describing the absence of bioengineering in the food." 7 U.S.C. § 1639c(c) (emphasis added). Likewise, the Act's relevant preemption provision, in § 295(b), applies to any state-law "requirement relating to the labeling of whether a food . . . is *genetically engineered* (which shall include such *other similar terms* as determined by the Secretary of Agriculture)." *Id*. § 1639i(b) (emphasis added). And § 2 of the public law that enacted the relevant amendments to the AMA provides that, if a food has been certified as organic "under the Organic Foods Production Act of 1990," 7 U.S.C.

§ 6501 *et seq*., then that "certification shall be considered sufficient to make a claim regarding the absence of bioengineering in the food, such as 'not bioengineered', '*non-GMO*', or *another similar claim*." Pub. L. No. 114-216, § 2, 130 Stat. at 838–39 (emphasis added) (classified to 7 U.S.C. § 6524). Thus, under the AMA, the AMS had the authority to establish a disclosure requirement that would use the term "bioengineered" or alternative "similar term[s], as determined by the [AMS]," 7 U.S.C. § 1639(1), which might conceivably include "genetically engineered" or "[]GMO," *id*. §§ 1639c(c), 1639i(b). But whether to actually employ such alternative terms in the disclosure standard was expressly left for the AMS to "determine[]." *Id*. § 1639(1).

In fashioning the disclosure standard, the AMS ultimately decided that the required disclosure must use the term "bioengineered." 7 C.F.R. § 66.102(a). Thus, although regulated entities were free to *add* additional terms (presumably including "genetically engineered" or "GMO") "so long as such statements are consistent with all other applicable laws and regulations," 83 Fed. Reg. at 65852, only the use of the term "bioengineered" would *satisfy* the disclosure requirement. In opting to uniformly require the particular term "bioengineered," the AMS explained that "[t]he Secretary believes that the language used by Congress in the amended Act"—namely, "bioengineered"—"clearly and accurately describes the technology and provides consumers with the information they desire." *Id*. After expressly acknowledging that the statute granted it the discretion to rely on other "similar terms," the AMS concluded that "using other terms such as genetic engineering or genetically modified organisms may create

inconsistencies with the preemption provisions or muddy the scope of disclosure."  *Id*. at 65837.

## B

Plaintiffs contend that the AMS's decision on this score was "arbitrary and capricious" under the APA and must be set aside.  5 U.S.C. § 706(2).  We disagree.

As an initial matter, we hold that the AMS permissibly concluded that the disclosure standard should rely on a single, uniform term that must be used in all disclosures. That is, it was not arbitrary and capricious for the agency to conclude that allowing regulated entities to satisfy the disclosure requirement by picking and choosing from a menu of different terms would "muddy the scope of disclosure."  83 Fed. Reg. at 65837.  As the AMS explained, requiring a single, uniform term would "ensur[e] disclosure consistency and minimiz[e] marketplace confusion."  *Id*. at 65851.   That conclusion is "reasonable and reasonably explained," and it is not arbitrary and capricious.  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

The key question, then, is whether the AMS properly determined that the required uniform term should be "bioengineered"   rather   than   "genetically   modified," "GMO," or some other similar term.  As noted, the AMS selected "bioengineered" because it was the term "used by Congress," it "clearly and accurately described the technology"   being   disclosed,   and   it   would   avoid "inconsistencies with the preemption provisions" of the Act. 83 Fed. Reg. at 65837, 65852.   In evaluating this explanation, we begin with the latter comment, because it bears on a proper understanding of the other two.

We construe the AMS's comment about "inconsistencies with the preemption provisions" to refer to the discussion, a few pages earlier in the AMS's notice of final rulemaking, concerning a subtle difference between the terms "bioengineered" and "genetically engineered" and the potential impact of that distinction on the scope of preemption.  Specifically, the AMS noted that one commenter suggested that the agency's regulations should define "bioengineered" more broadly than in the Act in order to avoid "state preemption concerns."  83 Fed. Reg. at 65835.  Given that the Act's definition of "bioengineering" was limited to "genetic material that has been modified *through in vitro recombinant deoxyribonucleic acid (DNA) techniques*," 7 U.S.C. § 1639(1) (emphasis added), the commenter expressed concern that foods containing genetic material modified through *other* techniques (such as "gene editing") would not be included in the definition of "bioengineering," even though the Act's preemption provision in "Sec. 295[] was not intended to be limited to the smaller subset of foods now defined as 'bioengineered.'"  83 Fed. Reg. at 65835.  The AMS concluded that no regulatory alteration of the statutory definition of "bioengineering" was warranted on this score, because the difference in language between the disclosure provision (which uses the term "bioengineered") and the preemption provision (which uses the phrase "genetically engineered") reflected a deliberate congressional choice to preempt state-law requirements that *exceeded* the Act's contemplated disclosure standard:

> AMS does not find it necessary to further define bioengineering.  AMS also disagrees with commenters' concerns that failing to further define bioengineering would result in limiting preemption.  Subtitle F of the

amended Act addresses Federal preemption
of State and local genetic engineering
labeling requirements. 7 U.S.C. 1639i. *The
preemption provisions extend beyond
bioengineering labeling and include genetic
engineering labeling requirements.*

83 Fed. Reg. at 65835 (emphasis added).

Against that backdrop, the AMS's comment that using
"genetically engineered" for the *disclosure* requirement
could lead to "inconsistencies with the preemption
provision" makes sense: it would suggest that the scope of
the Act's preemption provision (which uses the term
"genetically engineered") is the *same* as the scope of the
disclosure provision, even though, in the latter provision,
Congress used a different term that the AMS considered to
have a narrower scope.[4]

Viewed in light of this context, the AMS's choice to use
the particular term that Congress itself chose—
"bioengineered"—was not arbitrary and capricious. Given
that commenters had argued that Congress's specific
definition of "bioengineering" did not cover food with
genetic material that had been modified using techniques
other than in vitro recombinant DNA techniques, whereas
the more general term "genetic engineering" reflected no
such limitation, the AMS reasonably concluded that it should
simply use the statutory term "bioengineered," which (by

---

[4] We therefore reject Plaintiffs' contention that the AMS's notice of final
rulemaking did not actually rely on this potential difference between
"bioengineered" and "genetically engineered" and that the AMS's
argument on this score is therefore a "newly minted rationalization" that
violates the *Chenery* rule.

definition) accurately describes the technology that Congress intended to be disclosed.

Plaintiffs' contrary arguments lack merit. Plaintiffs contend that the Act's use of the terms "bioengineered" and "genetically engineered" are "interchangeable" and that the definition of "bioengineering" therefore must be understood "to include any foods with *genetical material* that has been *modified*." But this argument overlooks the fact that the Act expressly limits the definition of "bioengineering" to those foods "contain[ing] genetic material that has been modified *through in vitro recombinant deoxyribonucleic acid (DNA) techniques*." 7 U.S.C. § 1639(1) (emphasis added). Thus, while we agree that the Act suggests that terms such as "genetically engineered" and "GMO" are *potentially* "similar" terms to "bioengineer[ed]," *see supra* at 37–38, the Act explicitly leaves it up to the AMS to "determine[]" whether those terms are "similar" in the sense that they, too, may be said to satisfy the statutory definition of "bioengineering." 7 U.S.C. § 1639(1). In light of that definition's specific limitation to genetic modifications accomplished through in vitro recombinant DNA techniques, and the potential that "genetic engineering" and "GMO" might sweep more broadly, the AMS was not arbitrary and capricious in declining to "determine[]" that the terms were "similar" in the sense that the statute requires and in declining to allow those terms to be used to satisfy the disclosure requirement.[5]

---

[5] Plaintiffs correctly note that the AMS did not specifically conclude that any other particular genetic modification technique does or does not fall within the statutory definition of "bioengineered." Instead, the agency stated that, as "[t]echnologies continue to evolve," it would consider, in consultation with appropriate other agencies, whether "food produced through a specific technology may or may not meet the definition of BE

For similar reasons, Plaintiffs are wrong in contending that the AMS did not adequately justify its rejection of the more common terms "GMO" and "genetically engineered" in favor of the statutory term "bioengineering." The AMS acknowledged that the former terms were more "familiar," 83 Fed. Reg. at 65851, but (as we have discussed) it also noted that those terms potentially bore a meaning that was broader than the specific definition of "bioengineered." The agency further concluded that, to the extent that "bioengineered" was less familiar, the proper response was for the AMS to "engage in outreach and education to provide information about the new disclosure term" rather than to use a term that was freighted with a potentially different meaning. *Id*.

For all of these reasons, we conclude that the AMS's decision to choose "bioengineered" as the uniform disclosure term was "within a zone of reasonableness" and reflects a "reasonabl[e] consider[ation] [of] the relevant issues." *Prometheus Radio Project*, 592 U.S. at 423. The district court therefore correctly held that the agency's action was not arbitrary and capricious.

## V

As noted earlier, the district court agreed with Plaintiffs that two regulations concerning particular *methods* of disclosure—*viz*., the regulations governing "electronic or

[bioengineered] food." 83 Fed. Reg. at 65819; *see also id*. at 65835 (noting that "AMS is not making a blanket statement regarding the scope of technologies that are covered" by the disclosure standard). But the agency was not required to make such technology-specific determinations in order to sustain its action here. It suffices that, as we have explained, there were sufficient grounds, as a general matter, for the agency to decline to conclude that the various terms were interchangeable.

digital link" disclosure, 7 C.F.R. § 66.106, and "text message disclosure," *id*. § 66.108—were unlawful under the APA and had to be remanded to the agency.  The district court, however, expressly remanded those two regulations "without vacatur," and Plaintiffs appeal that refusal to vacate these rules.   In addressing this contention, we first summarize the district court's rulings concerning these two regulations before turning to Plaintiffs' specific challenges to the district court's choice of remedy.

## A

Section 293(b)(2)(D) of the Act addresses the "*form* of a food disclosure under this section," stating that, subject to certain exceptions, the regulations shall "require" that the disclosure be made in either "[1] a text, [2] symbol, or [3] electronic or digital link, . . . with the disclosure option to be selected by the food manufacturer."    7 U.S.C. § 1639b(b)(2)(D) (emphasis added).

Section 293 contains two other provisions that more specifically address the Act's third option of an "electronic or digital link."   First, § 293(d) provides additional details about the mechanics of any such disclosure.  Thus, for example, § 293(d) states that any "electronic or digital link disclosure" shall be accompanied by "on-package language" that "indicat[es] that the electronic or digital link will provide access to an Internet website or other landing page by stating only 'Scan here for more food information' or equivalent language that only reflects technological changes."    7  U.S.C.  § 1639b(d)(1)(A).    As the AMS acknowledged in its notice of final rulemaking, the "[c]urrent technology" for providing such an electronic or digital link "includes, among others, quick response (QR) codes that are detectable by consumers and digital

watermark technology that is imperceptible to consumers but can be scanned anywhere on a food package using a smart phone or other device." 83 Fed. Reg. at 65828. The regulation specifies that, if a QR code is used, the statutorily required instruction to "Scan here for more food information" must be directly above or below that QR code. 7 C.F.R. § 66.106(a)(1). Section 293(d) further provides that "the electronic or digital link disclosure" must "also include[] a telephone number that provides access to the bioengineering disclosure." 7 U.S.C. § 1639b(d)(4). The regulations state that these "telephone number instructions must be in close proximity to the digital link and accompanying statement" and "must be accompanied by the statement 'Call [1-000-000-000] for more food information.'" 7 C.F.R. § 66.106(a)(2). A consumer who calls the number must be provided with the "bioengineered food disclosure, . . . regardless of the time of day." *Id*.

Second, § 293(c) directs the Secretary to promptly "conduct a study to identify potential technological challenges that may impact whether consumers would have access to the bioengineering disclosure through electronic or digital disclosure methods." 7 U.S.C. § 1639b(c)(1). If the Secretary determines, based on that study, "that consumers, while shopping, would not have sufficient access to the bioengineering disclosure through electronic or digital disclosure methods, the Secretary, after consultation with food retailers and manufacturers, shall provide additional and comparable options to access the bioengineering disclosure." *Id*. § 1639b(c)(4). The required study was conducted by Deloitte Consulting LLP, and, "[a]fter reviewing the study" and considering the comments received after publication of the study, the Secretary "determined that consumers would *not* have sufficient access to the

bioengineering disclosure through electronic or digital means under ordinary shopping conditions at this time." 83 Fed. Reg. at 65828 (emphasis added). The AMS was thus required to "provide additional and comparable options to access the bioengineering disclosure," 7 U.S.C. § 1639b(c)(4), and the AMS stated that it would therefore adopt "the text message option" that it set forth "in § 66.108." 83 Fed. Reg. at 65828. Under that option, the food's "label must include this statement[:] 'Text [command word] to [number] for bioengineered food information.'" 7 C.F.R. § 66.108(a).

In the relevant cause of action in their operative complaint, Plaintiffs asserted an APA challenge to both the "electronic or digital link" disclosure in § 66.106 and the "text message" disclosure in § 66.108. The district court granted summary judgment to Plaintiffs on this claim. Addressing the Act's instruction that the AMS "shall provide additional and comparable options to access the bioengineering disclosure" if the required study showed that consumers would "not have sufficient access to the bioengineering disclosure through electronic or digital disclosure methods," 7 U.S.C. § 1639b(c)(4), the district court held that this provision required the agency to fashion additional options "to *fix* the problem of inaccessible electronic disclosures" (emphasis added). The district court concluded that, rather than fix the inadequacies of the electronic or digital link disclosure, the AMS simply left that deficient option in place and instead added a fourth alternative option, even though "nothing in the statute permitted AMS to expand the disclosure options for manufacturers beyond the 'text, symbol, or electronic or digital link' choices" (quoting 7 U.S.C. § 1639b(b)(2)(D)). The district court therefore held that the AMS acted contrary

to law (1) by allowing manufacturers to use an unremedied electronic or digital link option that the statutorily required study had shown to be deficient; and (2) by adding a freestanding non-statutory fourth option allowing for a text-message disclosure.[6]

The district court then turned to the issue of the appropriate remedy.  The district court acknowledged our decision in *Alliance for the Wild Rockies v. U.S. Forest Service*, 907 F.3d 1105 (9th Cir. 2018), which held that "vacatur of an unlawful agency action normally accompanies a remand." *Id*. at 1121.  As the district court further noted, we have held that, in determining whether the ordinary remedy of vacatur should be applied, the court must consider "how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *California Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (simplified).  Addressing these factors, the district court concluded that, although the challenged "text message disclosure decision was a significant error," the AMS had presented "legitimate and persuasive" concerns "that vacatur would disrupt consumer access to bioengineering disclosures" and would "disrupt the food industry, which was required to comply with the regulations as of January 1, 2022."  Accordingly, the district court remanded the two challenged rules (§ 66.106 and § 66.108) "without vacatur."

---

[6] We reject the AMS's suggestion that the district court order should be construed as adopting only the second of these holdings.  That contention ignores the reasoning set forth in the order and the district court's explicit decision to remand *both* § 66.106 and § 66.108 to the agency.

## B

On appeal, Plaintiffs challenge the district court's refusal to vacate the two challenged regulations when it remanded them to the agency "for further consideration in a manner consistent with [its] order."   The standards governing whether to vacate a regulation under the APA are well settled in our precedent.  Where, as here, "a court holds an agency action unlawful, vacatur and remand is the default remedy under the APA, but the court retains equitable discretion in 'limited circumstances' to remand a decision without vacatur while the agency corrects its errors." *Montana Wildlife Fed. v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025) (citation omitted). "Whether agency action should be vacated depends on [1] how serious the agency's errors are and [2] the disruptive consequences of an interim change that may itself be changed." *Id*. (simplified).  The district court's application of these two factors in the context of particular regulations "is reviewed for abuse of discretion." *Id*.[7]

---

[7] The AMS acknowledges our established caselaw on these points, but it contends that our precedent is incorrect, that "the APA does not authorize vacatur," and that Plaintiffs are limited to "traditional equitable remedies like injunctions" that must be "'limited' and 'tailored' to redress the parties' 'particular injury.'"  As a three-judge panel, however, we are bound to follow our existing precedent unless it is "clearly irreconcilable" with intervening higher authority. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003).  For substantially the reasons explained at length by Justice Kavanaugh in his concurring opinion in *Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, 603 U.S. 799, 833–43 (2024) (Kavanaugh, J., concurring), our existing precedent concerning vacatur of agency rules under the APA can be reconciled with the Court's more recent precedent limiting the scope of equitable relief available in actions that rely on traditional equitable causes of action rather than on the APA. *Cf. Trump v. CASA, Inc.*, 606 U.S. 831, 841 & n.4 (2025) (noting that that decision's limitation on "universal injunctions" "rests solely on the statutory authority that

The first factor—the seriousness of the agency's error—weighs in favor of vacatur. Because the AMS did not cross-appeal the district court's decision holding that § 66.106 and § 66.108 were unlawful, we take it as established that the two rules are unlawful in the way that the district court concluded and that the AMS's adoption of them was therefore "a significant error."**[8]**

In weighing this first factor, we have also considered whether the agency's error is a technical or procedural one, such that the agency "could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir. 2015); *see also Migrant Clinicians Network v. U.S. EPA*, 88 F.4th 830, 848 (9th Cir. 2023). Here, the substance of the district court's ruling unquestionably precludes readoption of the two challenged rules in their current form: the district court squarely held that (1) the Act does not allow the AMS to add a fourth option (text messaging) to the three statutory options (text, symbol, or electronic or digital link); and (2) the Act requires the agency to "fix the problem of inaccessible electronic disclosures" by "*adding* 'additional and comparable options,' like the alternative text message instructions, *to* the

---

federal courts possess under the Judiciary Act of 1789"); *id*. at 873 (Kavanaugh, J., concurring) (noting that the Court's decision did not alter any power of a district court to "grant or deny the functional equivalent of a universal injunction . . . by preliminarily setting aside or declining to set aside an agency rule under the APA"). Because our precedent thus can be reconciled with intervening Supreme Court authority, we are bound to follow it in this case.

[8] We therefore have no occasion to decide whether the district court's unchallenged ruling on that score was correct.

electronic disclosure" (emphasis added). The AMS emphasizes that the Act explicitly requires an electronic or digital link option, but the AMS overlooks the fact that, under the district court's ruling, the *existing* form of that option itself violates the Act and cannot lawfully be retained on remand. In sum, the fact that the two challenged rules are unlawful in a way that precludes their readoption on remand to the agency underscores that the AMS committed a serious error that weighs in favor of vacatur.

The question, then, is whether the district court abused its discretion in concluding that the AMS had made a sufficient showing of "disruptive consequences," *Montana Wildlife Fed.*, 127 F.4th at 50, to "overcome the presumption of vacatur," *Alliance for the Wild Rockies*, 907 F.3d at 1122. The district court identified two countervailing concerns, but neither supports its complete refusal to vacate the two remanded provisions.

First, the district court was persuaded by the concern that "vacatur would disrupt consumer access to bioengineering disclosures," but this unadorned comment fails to account for the Secretary's own finding—which is well supported in the record—that the existing electronic or digital link option provides *inadequate* access to bioengineering disclosures. *See* 83 Fed. Reg. at 65828. Allowing an inadequate disclosure option to continue throughout the entirety of the administrative process for amending the regulations would *itself* perpetuate a disruption in "consumer access to bioengineering disclosures."

Second, the district court concluded that "vacatur would disrupt the food industry," which was already operating under, and in reliance on, the existing menu of options. Plaintiffs contend that this concern is without record support,

but that is wrong: as Intervenors note, the administrative record confirms that tens of thousands of products were already being labeled with digital links as of 2018 and that number was expected to grow. Moreover, the administrative record also amply confirms the obvious point that changing labels is a logistically cumbersome task that takes time to accomplish. *See* 83 Fed. Reg. at 65832 (noting that "regulated entities should have sufficient time to transition their . . . labeling processes and procedures"); *id*. at 65861–62 (noting that the AMS implemented compliance dates to accommodate the "time and cost involved in," *inter alia*, "modifying labels").

Although this disruptive concern is sufficiently supported in the record, the district court nonetheless abused its discretion in holding that this factor supported a complete denial of vacatur. As Plaintiffs correctly note, this concern would be fully addressed by ordering only a *prospective* vacatur of the two challenged provisions—*e.g.*, by delaying the effective date of the vacatur or "setting a timeline" for selling through any existing inventory of already-labeled products. But there is no basis in the record for concluding that this concern justifies a blanket allowance, for the entirety of the administrative process, to continue using disclosure options that have been found to be inadequate and unlawful. Moreover, prospective vacatur would also mitigate, if not eliminate entirely, the district court's related concern about disrupting consumer access to the bioengineering disclosure during the administrative process.

Accordingly, we reverse the district court's decision to deny vacatur of § 66.106 and § 66.108, and we remand with instructions to fashion an appropriate prospective vacatur of these rules after receiving input from the parties on that specific point.

## VI

We conclude by briefly summarizing our holdings. With respect to the relevant regulatory provisions that exclude from the definition of "bioengineered food" any food as to which "the genetic material is not detectible pursuant to [7 C.F.R.] § 66.9," 7 C.F.R. § 66.1, we reverse the district court's grant of summary judgment to Defendants on Plaintiffs' APA cause of action challenging those provisions, and we remand with instructions (1) to grant summary judgment to Plaintiffs on that cause of action; (2) to remand the relevant regulations to the AMS; and (3) to determine, after receiving input from the parties, whether any portions of the regulations should be vacated in connection with that remand to the agency. We also reverse the district court's decision not to vacate the regulations contained in 7 C.F.R. §§ 66.106 and 66.108, and we remand with instructions to prospectively vacate those rules after receiving the parties' input. We affirm the district court's judgment in all other respects.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**